**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ASSOCIATION OF ADMINISTRATIVE** | ) | |
| **LAW JUDGES, JUDICIAL COUNCIL** | ) | |
| **NO. 1, IFPTE, AFL-CIO & CLC;** | ) | |
| **CYNTHIA M. BRETTHAUER;** | ) | |
| **ROBIN L. HENRIE; and GILBERT A.** | ) | |
| **MARTINEZ;** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **No.** |
| | ) | |
| **CAROLYN W. COLVIN, ACTING** | ) | |
| **COMMISSIONER SOCIAL SECURITY** | ) | |
| **ADMINISTRATION;** | ) | |
| | ) | |
| **Defendant.** | ) | |

**COMPLAINT**

Plaintiffs Association of Administrative Law Judges, Judicial Council No. 1, IFPTE,

AFL-CIO & CLC; Cynthia M. Bretthauer; Robin L. Henrie; and Gilbert A. Martinez, for their

Complaint against Carolyn W. Colvin, Acting Commissioner Social Security Administration,

state as follows:

**INTRODUCTION AND OVERVIEW OF CLAIMS**

1.      The review and adjudication of disability claims by the Social Security

Administration ("SSA" or "Agency") is a system in crisis.  The United States Supreme Court has

recognized that the SSA disability hearing system is "probably the largest adjudicative agency in

the world."  Approximately 3.3 million disability claims are filed each year, a 57% increase since

1990.  Over the last five years, SSA disability workloads have grown significantly due to, among

other factors, an aging Baby Boomer population reaching their disability-prone years and the

Great Recession of 2008 with its lingering high unemployment.  Congress has responded to these

demographics by making matters worse. As the most recent SSA Commissioner finally

conceded on his departure in February 2013, the SSA has simply not gotten the necessary

resources from Congress to address this rising number of disability claims. The chronic lack of

resources has had a multiplier effect on the time required to resolve claims, with disability

claimants being forced to wait a year or longer for their claims to be decided.

2.      This lawsuit is about SSA administrative law judges ("ALJs"), who hear appeals

from disability claims denied at the state level. For years, the ALJs have been scapegoated by

SSA senior management for delays in the hearing process. Instead of attacking the underlying

reality of the delays – more claims and failure to allocate adequate resources – the SSA has

imposed an illegal production quota on the ALJs, requiring them to decide 500-700 cases a year,

a number so unreasonable that one United States Magistrate Judge calls it "unconscionable."

The SSA admits the quota was not set pursuant to any documented methodology. As such, it is

an arbitrary and unlawful performance evaluation. In fact, the quota is wholly unrelated to the

complexity of the mix of cases assigned to any individual ALJ. Instead, it is derived from

commitments made by SSA senior management to the Office of Management and Budget to

deliver a minimum number of fiscal year "budgeted dispositions" in exchange for fiscal year

funding at a given level and reflects fiscal, political, and other pressures unrelated to actual ALJ

decision-making, in violation of the Administrative Procedure Act.

3.      The quota infringes on the statutorily-guaranteed right of the ALJs to decisional

independence, and has resulted in disparities in allowance rates among ALJs that academics and

commentators agree is "alarming." For some ALJs, because awarding benefits is easier and less

time-intensive, the quota tends to dictate the outcome of cases in favor of the claimant, to the

detriment of the Social Security Trust Fund, taxpayers and the public fisc. For other ALJs, being rushed to judgment by the quota impedes their ability to render carefully-reasoned, impartial decisions based on a fully developed factual record. One federal appeals court noted in 2011 that a study had found that more than half of all ALJ decisions were reversed or remanded by the district court. Finally, the quota has required ALJs to cut corners in the hearing process, thereby violating the procedural due process rights of the disability claimants guaranteed by the United States Constitution. This lawsuit seeks declaratory and injunctive relief barring the SSA from enforcing the current decisional quota of 500-700 decisions per year, and from utilizing any other production quota.

## PARTIES

### Plaintiffs

4.     The Association of Administrative Law Judges, Judicial Council No. 1, IFPTE, AFL-CIO & CLC ("AALJ") is affiliated with the International Federation of Professional and Technical Engineers ("IFPTE"), AFL-CIO, and is the exclusive bargaining representative of over 1,200 non-supervisory federal ALJs who adjudicate cases involving the Agency. The AALJ is a non-profit corporation under the District of Columbia Business Organization Code. Any ALJ appointed pursuant to the statutory provisions of 5 U.S.C. §3105 and employed by the federal government as an ALJ in a bargaining unit represented by the AALJ is eligible for membership in the AALJ. The AALJ also grants associate membership to ALJs not in bargaining units represented by AALJ. The ALJs represented by the AALJ maintain offices and adjudicate cases throughout the United States, and several ALJs maintain offices and adjudicate cases in this judicial district.

5.     The purposes of the AALJ are to preserve, promote, and improve (a) the guarantees and protections provided by the United States Constitution, the Social Security Act, the Administrative Procedure Act, and all other federal laws; (b) the working conditions of ALJs; (c) the professionalism and competence of ALJs by insuring opportunities for continuing professional education and training; and (d) the rights of its members through collective bargaining and all other lawful concerted activities.

6.     Judge Cynthia M. Bretthauer is an individual residing in Northbrook, Illinois. She is an administrative law judge in the Evanston, Illinois Hearing Office.  Judge Bretthauer has been an ALJ with the SSA for fifteen years, and served as the Hearing Office Chief Administrative Law Judge ("HOCALJ") for the Evanston Hearing Office from 2001 until 2005.

7.     Judge Robin L. Henrie is an individual residing in Bountiful, Utah.  He is an administrative law judge in the Salt Lake City, Utah Hearing Office.  Judge Henrie has been an ALJ with the SSA for twenty-two years.

8.     Judge Gilbert A. Martinez is an individual residing in Salt Lake City, Utah.  He is an administrative law judge in the Salt Lake City, Utah Hearing Office.  Judge Martinez has been an ALJ with the SSA for twenty-four years, and served as HOCALJ for the Salt Lake City Hearing Office from 1993 until 1997.

9.     Judges Bretthauer, Henrie, and Martinez are referred to collectively as the "Individual Plaintiffs."

**Defendant**

10.     Carolyn W. Colvin is the Acting Commissioner Social Security Administration.

4

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction herein pursuant to 28 U.S.C. §1331, the

Administrative Procedure Act ("APA"), 5 U.S.C. §§701 *et seq*., and the Declaratory Judgment

Act, 28 U.S.C. §2201.

12.     Venue is proper in this district under 28 U.S.C. §1391(e) and 5 U.S.C. §703

because, among other things, one or more of the plaintiffs resides in this district and the Agency

maintains hearing and administrative offices in the district.

## FACTS

13.     The Agency was created by Congress in 1935 to administer America's social

security programs, and provide benefits to qualified retired and disabled workers and their

dependents, and to survivors of insured workers.  Social Security benefits are essential to the

economic well-being of tens of millions of Americans.  This Complaint involves the formal

adjudication of claims by ALJs for benefits under the Old Age, Survivors, and Disability

Insurance ("OASDI") programs under Title II of the Social Security Act ("Act") and the

Supplemental Security Income ("SSI") program under Title XVI of the Act.

14.     OASDI pays benefits to claimants with disabilities (and to certain members of

their families) if they are "insured," meaning that they worked long enough and paid Social

Security taxes.  SSI pays benefits to disability claimants based on financial need.  When an

individual applies for either program, the SSA collects medical and other information to

determine whether the individual meets the SSA definition of disability.  Under the Act,

disability is defined as the inability to do any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of not less than 12 months. To meet this definition, a claimant must have a severe impairment(s) that precludes performance of past relevant work or any other substantial gainful work that exists in significant numbers in the national economy. 20 CFR §§404.1505, 416.905.

15.     ALJs perform a critical function, ruling each year on hundreds of thousands of disability claims brought under the Act. Each disability claim granted is estimated to cost $300,000 in lifetime benefits. In fiscal year 2011, the Agency paid $128 billion in OASDI benefits, $52.4 billion in SSI benefits, and over $1 billion in attorneys' fees to disability claimants' representatives. ALJs adjudicate claims pursuant to the requirements of the Act and the APA. Approximately 1,500 ALJs are currently employed by the SSA.

## The SSA Disability Claim Hearing Process

16.     A claimant for disability benefits must first file a claim in an SSA district office. The claim is then forwarded to the state's Disability Determination Service ("DDS"), which makes an initial disability determination using federal guidelines.

17.     If benefits are denied, a claimant (in most states) may seek reconsideration of the denial. The claimant will be assigned a new adjudicator and may introduce new or additional evidence in support of the claim.

18.     A claimant denied benefits after reconsideration may seek a hearing before an SSA ALJ. *See* 42 U.S.C. §§423, 1381a. The SSA Office of Disability Adjudication and Review ("ODAR") is responsible for holding these hearings and issuing decisions based on the law. There are two components to ODAR – the Office of the Chief Administrative Law Judge ("OCALJ") and the Office of Appellate Operations.

19.     The OCALJ directs a nationwide field organization comprised of ten regional offices, 169 hearing offices, five national hearing centers, and one national case assistance center.  Each regional office has a chief administrative law judge ("RCALJ").  Each Hearing Office also has a chief administrative law judge ("HOCALJ").

20.     The ALJ conducts a *de novo* in-person hearing at which the disability claimant may introduce evidence in addition to that presented at the DDS stage.  The hearings must protect the procedural due process rights of the claimants, conform to the requirements of the Administrative Procedure Act, 5 U.S.C. §550 *et seq*., and follow the sequential evaluation methodology required by the Act, its implementing regulations, and Social Security Rulings.  42 U.S.C. §405(b); 20 CFR §§404.1501 *et seq*., 416.901 *et seq*.

21.     If benefits are denied by the ALJ after the *de novo* hearing, a disability claimant may seek review by the SSA Appeals Council, a part of ODAR's Office of Appellate Operations.  If the denial of benefits is upheld by the Appeals Council, the claimant may appeal to the United States District Court.

**Duties and Obligations of ALJs**

22.     An ALJ is required by the Act and case law to wear "three hats," *i.e.* (1) the ALJ must preside at the hearing as a fair and impartial judge and decision-maker; (2) the ALJ must protect the Social Security Trust Fund and taxpayers by denying unfounded claims; and (3) the ALJ must scrupulously protect the interests of the claimant in receiving a full and fair due process hearing, even if the claimant has legal representation.

23.     Unlike a district court judge, an ALJ plays an active role in both the fact-gathering *and* fact-finding processes.  SSA hearings are intended to be "inquisitorial" rather than

7

"adversarial."  It is the responsibility of the ALJ to ensure that the factual record is fully

developed.  The ALJ gathers evidence and calls medical and vocational experts, as needed.  The

Agency is not represented at the hearing.

        24.     The Agency position description for ALJs, as approved by the U.S. Office of

Personnel Management, specifies the numerous tasks an ALJ must undertake to conduct hearings

in compliance with the Act and the APA:

> "(1) dismiss or allow requests for hearings and rule on requests for extensions; (2) identify problems and issues to be resolved; (3) analyze all previously developed evidence and appraise previous licensing, regulatory, and adjudicative processes by the administrative agency; (4) determine whether there are other parties with adverse interest to be joined in the case; (5) issue subpoenas and rule on petitions to revoke subpoenas; (6) correlate and resolve conflicting evidence; (7) hear testimony and rule on all motions, petitions, or exceptions involving questions of law, procedure, and the admissibility of evidence; (8) hold prehearing conferences with the appellant and/or his counsel and the government representative; (9) make all evidence of record available to the parties and inform them of any evidence or expert testimony required in connection with a material point or issue; (10) administer oaths and affirmations; (11) govern the conduct of the parties at the hearing, and in general regulate the entire course of the proceedings; (12) control the examination and cross-examination of witnesses; (13) introduce into the record documentary and other evidence deemed necessary for the completion or full development of the record; (14) hear oral argument, and receive and consider briefs that are submitted; (15) appraise the credibility of witnesses, and resolve conflicts in lay and expert evidence; (16) consider and dispose of proposed findings of fact and conclusions of law submitted by the claimants or government representatives; (17) make findings of fact on each issue, giving the reasons therefore and render conclusions of law as sole Trier [sic] of fact and law; (18) fully consider all the evidence of record and issue decisions within the requirements of the Administrative Procedure Act, which decisions are completely independent and final, signed only by him [sic], and published to parties in interest without prior review; and (19) entertain petitions for attorneys fees and issue orders designating the amount of fee permitted."

Form SSA-801, Position Description No. 66622, Administrative Law Judge, Non-Supervisory, AL-935. (Exhibit A hereto.)

25.     In the course of disposing of a case, ALJs are obligated, among other things, to: (1) review and decide requests to change the time or place of the hearing, 20 CFR §404.936; (2) rule on objections to the notice of issues to be decided at the hearing, 20 CFR §404.939; (3) "look fully into the issues," question witnesses and accept documents into evidence, 20 CFR §404.944; (4) issue subpoenas if necessary for the full presentation of a case, 20 CFR §404.951; (5) issue a written decision that includes findings of fact and reasons for the decision, 20 CFR §404.953; (6) develop a complete medical history of the claimant for at least the preceding 12 months, and provide evidence at the hearing about the existence of work available for the claimant, 20 CFR §404.1512; (7) consider all the evidence in the record, 20 CFR §404.1520; and (8) obtain additional evidence, if necessary, 20 CFR §404.1520b.

### ALJ Decisional Independence

26.     In enacting the APA, Congress created a special category of quasi-judicial independent decision-makers who are directly vested, at the time of their appointment to the position, with all powers necessary to hold hearings and issue decisions comporting with due process of law, free from agency interference or control. An ALJ's powers arise from the APA, 5 U.S.C. §556(c)(1)-(10), and its implementing regulations, 5 C.F.R. §§930.201 *et seq.*, without the necessity of express SSA delegation, and the SSA is without authority to withhold such powers from its ALJs. Atty. General Manual on the APA at 74 (1947).

27.     The Congressional enumeration of the powers of ALJs in 5 U.S.C. §556(c) "is designed to secure that responsibility and status which the Attorney General's Committee

stressed as essential." Sen. Doc. No. 248, 79th Cong., 2nd Sess., 29 (1946). The direct investiture of enumerated powers by Congress to ALJs under 5 U.S.C. §556(c), coupled with the Attorney General's strong statement in the Manual on the APA that agencies lack the power to withhold §556(c) powers from its ALJs, is the genesis of the concept of ALJ decisional independence.

28.     The SSA Position Description for the ALJ position makes clear that an ALJ "has full responsibility and authority to hold hearings and issue decisions" and that an ALJ's adjudicatory powers and duties shall be carried out "in conformity with the Administrative Procedure Act, and with full and complete individual independence of action and decision."

29.     ALJs enjoy decisional independence under the Act, the APA, and established judicial precedent. The United States Supreme Court in *Ramspeck v. Federal Trial Examiners Conference*, 345 U.S. 128, 131-32 (1953), recognized long ago that Congress intended hearing examiners (now referred to as ALJs) to be a "special class of semi-independent subordinate hearing officers" entitled to "independence and tenure." Twenty-five years later, it underscored the importance of ALJ independence in *Butz v. Economou*:

> "[T]here can be little doubt that the role of the modern federal hearing examiner or administrative law judge ... is 'functionally comparable' to that of a judge ... the process of agency adjudication is currently structured so as to assure that the hearing examiner exercises his independent judgment on the evidence before him, free from pressures by either the parties or other officials within the agency."

438 U.S. 478, 513-514 (1978).

30.     The hallmark of decisional independence is the freedom to conduct a fair hearing based on a fully developed factual record and the law, impartially, without interference by the parties, SSA management, and political or other pressures.

31.     The APA and its implementing regulations guarantee decisional independence in a number of ways.  For example, an ALJ may not consult any person or party – including agency officials – concerning facts at issue in the proceeding, except with notice and opportunity for all parties to participate.  5 U.S.C. §554(d)(1).  When conducting a hearing, an ALJ is not responsible for or subject to the supervision or direction of agency employees.  5 U.S.C. §554(d)(2).  ALJs may not be assigned to "perform duties inconsistent with their duties and responsibilities as administrative law judges."  5 U.S.C. §3105.  Cases are assigned to ALJs on a rotational basis, as far as practicable.  *Id.*  An agency is prohibited from interfering with ALJ performance in the writing of opinions and conducting hearings.  *Id.*

32.     While ALJs are SSA employees, they may be removed from their position only upon a showing of good cause and after a hearing before the Merit Systems Protection Board ("MSPB").  5 U.S.C. §7521; 5 C.F.R. §930.211(a).   The Office of Personnel Management ("OPM") controls compensation for ALJs.  5 U.S.C. §5372.

33.     No agency, including the SSA, may evaluate the performance of an ALJ.  5 C.F.R. §930.206.  Congress has recognized that "agencies are not, at any time, permitted to appraise ALJ performance."  Joint Report of Comm. on Government Affairs and Comm. on the Judiciary, Reform of Federal Regulation, S. Rep. No. 1018, 96th Cong., 2d Sess., pt. 2, at 69 (1980) ("S. Rep. No. 1018").

34.     Agencies have from time to time attempted to circumvent the prohibition against performance evaluations by imposing production standards, which rank and rate ALJ performance based on allegedly objective units of output.  Production standards that operate as a fixed quota, however, violate the prohibition against performance evaluations and infringe on

ALJ decisional independence. *See Nash v. Bowen*, 869 F. 2d 675, 680 (2d Cir. 1989) ("[t]he setting of reasonable production goals, as opposed to fixed quotas, is not in itself a violation of the APA.")

35.    An attempt by the SSA in the 1970s to impose production standards was challenged in *Bono v. United States of America Social Security Administration*, U.S.D.C. W.D. Mo., No. 77-0819-CV-W-4. The SSA settled the *Bono* case and entered a Settlement Agreement in which it agreed it "will not issue directives or memoranda setting any specific number of dispositions by ALJs as quotas or goals." (Exhibit B, ¶3.)

### SSA Establishes an Illegal Production Quota in Violation of ALJ Decisional Independence

36.    On April 18, 2007, then-Chief Administrative Law Judge ("CALJ") Frank A. Cristaudo announced the adoption of a series of "Benchmarks" allotting a certain number of calendar days for designated stages in the hearing process. (Exhibit C.) Some of the Benchmarks apply to ALJ-controlled stages of the hearing process. For example, one Benchmark allots an ALJ seven calendar days prior to a hearing to review the case, and another seven calendar days after a hearing to complete his/her review of the record and move it to the next stage in the hearing process. The Benchmarks attach regardless of the complexity of the case, the quantum of evidence, the number of cases on an ALJ's docket, or the legal issues involved.

37.    SSA has admitted there are no validation studies supporting the Benchmarks. In fact, the Benchmarks are arbitrary.

38.     The Benchmarks were initially referred to as "*guidelines*" by the SSA to avoid the prohibition against performance evaluations, production standards, and fixed quotas.  (*See* Exhibit C at 1; emphasis in original.)

39.     CALJ Cristaudo, on October 31, 2007, then circulated a "Dear Colleagues" letter to all ALJs.  (Exhibit D.)  In the letter (the "Directive"), the SSA directed that each ALJ "manage their docket in such a way that they will be able to issue 500-700 legally sufficient decisions a year."  CALJ Cristaudo, in a later "Dear Colleagues" letter, has described a "legally sufficient decision" as one "that provides findings and rationale that comply with the [Social Security] Act, Regulations, and Rulings, and explains why the preponderance of evidence supports the decisions and findings."  (Exhibit E.)

40.     The Directive referred to the required number of dispositions as a "goal," again seeking to avoid the prohibition against performance evaluations, production standards, and fixed quotas.  As discussed further below, however, the SSA soon began utilizing the Directive in conjunction with the Benchmarks and other practices as an illegal decisional quota.

41.     The Directive also circumvented the SSA's own agreement in the *Bono* settlement "not [to] issue directives or memoranda setting any *specific* number of dispositions by ALJs as quotas *or goals*."  (Exhibit B at ¶3; emphasis added).  Following the *Bono* settlement, then-Acting Associate Commissioner Donald A. Gonya in an internal SSA memorandum dated July 26, 1979, confirmed that the agreement not to issue directives setting a specific number of dispositions by ALJs applied to "headquarters staff and to management officials in the regional and hearing offices ["ODAR Managers"] as well."  (Exhibit F.)

13

42.     In an internal memorandum dated February 6, 2008, the SSA Inspector General advised the SSA Commissioner that the APA required that a production goal be "reasonable." (Exhibit G.)  The Inspector General advised further that the SSA "will need to document the methodology used to establish" any production goal.  (Exhibit G at 4.)

43.     The Directive did not result from the application of any known documented methodology.  When the AALJ requested supporting documentation, it was told the SSA had no data and had performed no studies to support the Directive.

44.     The same Inspector General memorandum reflected that fewer than 45% of the 895 "fully available" ALJs had processed 500 cases in Fiscal Year 2006.  (Exhibit G.)  The memorandum did not assess the reasonableness of any disposition rate or recommend any disposition rate to the SSA Commissioner.

45.     In an End of Fiscal Year Report for Fiscal Year 2008, the SSA re-characterized the Directive not as a goal but as an "expectation [for] all ALJs."  Other subsequent SSA communications refer to the Benchmarks and Directive as "scheduling expectations," "minimum Agency expectation of 500 dispositions per year," and "dispositional expectations."

46.     The SSA has taken formal disciplinary action to enforce the Benchmarks and Directive.  Removal proceedings citing the failure of an ALJ to meet the Benchmarks and Directive have been brought by the SSA before the MSPB.  The SSA has also issued formal reprimands based on violations of the Benchmarks and Directive.  ALJs have been subjected to less formal discipline such as "counseling," as well as threats and intimidation.

47.     CALJ Cristaudo has required ODAR Managers to explain to OCALJ why ALJs produce fewer than 500 dispositions.  Individual ALJs who have failed to meet the decisional

quota – including one ALJ in the Springfield, Missouri Hearing Office who had achieved 490 dispositions, but was nonetheless still ten below the quota – have been required to explain why they have failed to do so in writing to ODAR Managers. ALJs have been subjected to "counseling" and off-the-record, performance-related actions by ODAR Managers for failing to keep pace with the Directive or for missing Benchmarks. "Counseling" and off-the-record actions, the purpose of which is to coerce an unlawful end such as performance evaluations or quotas, are forms of discipline, and have been a first step to more formal SSA disciplinary action.

48.     With regard to SSA threats and intimidation, on November 10, 2008, the SSA proposed new rules allowing SSA management to take away from "those ALJs who are not processing a sufficient number of cases" the right to schedule their own hearings. (Exhibit H.) The Notice of Proposed Rulemaking confirmed that "ALJs will need to process at least 500 cases per year."

49.     CALJ Cristaudo participated in a phone call on March 18, 2009, with the National Executive Committee of Plaintiff AALJ to discuss the Benchmarks and Directive. In an attempt to deflect AALJ concerns, Cristaudo said he would consider issuing a written message to ODAR Managers advising that the Directive was not a quota. If such a written message was ever issued by Cristaudo, it has never been disclosed.

50.     On October 30, 2009, an ALJ in the Charleston, West Virginia Hearing Office was "informally counseled" for closing only 495 cases in Fiscal Year 2009, just five cases below the decisional quota. SSA retaliation against ALJs who fail to meet the Directive by a mere five or ten cases confirms it is a fixed quota.

51.     ODAR Managers carefully monitor ALJ dispositions, and since at least 2009, as a form of discipline, periodically publicize within Hearing Offices the names of individual ALJs whose production is not on pace to meet the Directive.  The targeted ALJs are required to explain why they are not on pace, to describe steps being taken to "ensure achievement" of the Directive, and to project the number of fiscal year dispositions they intend to issue.  One ODAR Manager has cautioned that responses to such inquiries of "[m]ore than a paragraph would not be a good use of your time or mine," confirming that the inquiries are designed more to harass and intimidate than to engage in a substantive, collegial dialogue.

52.     ODAR Managers have refused to take vacation and earned leave time into consideration when monitoring the scheduling of hearings by ALJs and number of dispositions, and have refused to accommodate ALJs suffering from serious medical conditions, including cancer, again reflecting the true nature of the Benchmarks and Directive as a fixed production quota.

53.     The Agency has also disciplined ALJs who have failed to meet the Benchmarks and Directive by withholding resources and staff.  ODAR Managers have also delayed approval or refused to approve requests to use earned annual leave for vacation as discipline for failing to keep pace with the Directive.

54.     When an ALJ is unexpectedly unavailable due to health or other reasons, the remaining ALJs in the Hearing Office are assigned more cases or asked to hold more hearings so that, in the words of the SSA, they do their "fair share" to make sure the Hearing Office meets its assigned decisional quota.

## The Agency Intensifies Enforcement of the Quota

55.     By at least Fiscal Year 2011 and likely earlier, ODAR began establishing decisional quotas for each SSA Region, for each Hearing Office, and for each individual ALJ within each Hearing Office.  To set these fixed quotas, SSA senior management first negotiates a nationwide "budgeted disposition" number with the Office of Management and Budget reflecting fiscal, political, and other pressures.

56.     All SSA quotas, including for the individual ALJs, are derived formulaically and are computed based on the number of cases all ALJs must dispose of per day in order to achieve the negotiated nationwide "budgeted disposition" number.  For Fiscal Years 2011 and 2012, the quotas were based on 2.37 dispositions per ALJ per day.  Each SSA Region is then "assigned" a decisional quota by OCALJ.  The SSA Region then assigns each Hearing Office a quota derived by dividing the quota for the Region by the number of ALJs in the Region.  Finally, each individual ALJ is "assigned" a quota by his/her Hearing Office derived, again, by dividing the Hearing Office quota by the number of ALJs in the Hearing Office.

57.     For example, in Fiscal Year 2011, the Eugene, Oregon Hearing Office was assigned a decisional quota of 3,920 ALJ dispositions, and each individual ALJ (with more than one year of experience) was assigned a quota of 585 dispositions.  OCALJ "assigned" 6,430 ALJ dispositions to the Manhattan Hearing Office in Fiscal Year 2012.  The quota for each ALJ in the Seattle Hearing Office in Fiscal Year 2012 was 593 dispositions, relayed only orally.

58.     One HOCALJ has expressed her understanding that the required number of dispositions has gone up because of promises made by SSA senior management to Congress, and that SSA pressure on ALJs is a direct result of Congressional pressure on the SSA.

59.     At a recent meeting, a HOCALJ included a written agenda item titled "On the radar and in the crosshairs," warning the ALJs that "[o]ur declining hearings scheduled and dispositions have put us on [the Agency] national and regional radar."

### The Requirement of 500-700 Decisions per Year is an
### Unreasonable Production Goal and a *De Facto* Fixed Quota

60.     The Benchmarks and Directive are an unreasonable production goal, the utilization and enforcement of which renders them an illegal *de facto* production quota.

61.     The Honorable Morton Denlow, then-Presiding Magistrate, United States District Court for the Northern District of Illinois, commented on the Directive in 2008:

> "Social Security cases are some of the most important cases on our docket in the Northern District of Illinois. I am required to read in its entirety each of the SSA records that come before me and I know you have a difficult job in writing opinions that will be upheld especially given the 7th Circuit's requirement to build a logical bridge between evidence in the record and the conclusion. In my opinion, I don't see how you can do 500-700 cases a year and satisfy the requirements of Due Process and the [SSA and APA] regulations."

62.     Despite the SSA Inspector General's warning that the SSA must document the methodology used to establish any production goal (Exhibit G at 4), the decisional quota of 500-700 decisions per year was not set pursuant to any documented methodology.

63.      Instead, the quota is based on a nationwide "budgeted disposition" number negotiated by SSA senior management and the Office of Management and Budget. Because that number reflects fiscal, political, and other pressures wholly unrelated to the substance, merits, and circumstances of claims actually pending or the individual ALJs, it is arbitrary. One ODAR Manager has admitted that the quota is a direct result of Congressional pressure on the SSA.

64.     The MSPB in *SSA v. Goodman*, 19 M.S.P.R 321 (1984), held that the SSA could not address the productivity of an individual ALJ "in the absence of evidence demonstrating the

18

validity of using [the SSA's] statistics to measure comparative productivity." In *Goodman*, the SSA at least attempted to measure comparative productivity between ALJs, though it lacked the statistical foundation to do so. The decisional quota set out in the Directive, however, is entirely unrelated to any statistical or other analysis of actual SSA claims or historical ALJ dispositions, and is instead "forced" based on outside fiscal, political and other pressures.

65.    The Benchmarks and Directive assume each disability claim and every ALJ is fungible, the same arbitrary assumption that underlies all quotas.

66.    Non-supervisory ALJs work without a dedicated support staff and have no clerical workers, paralegals, or attorneys who report to them or work under their direct supervision. The Benchmarks and Directive wrongly assume every ALJ has the same access to competent staff and resources.

67.    SSA procedure mandates that after the ALJ makes his/her ruling, most decisions are drafted by non-ALJ staff writers (attorneys and paralegals) based on instructions from the ALJ. SSA allots a staff writer four hours to write a decision awarding benefits, and eight hours to write a decision denying benefits. Federal courts spend an average of 4.6 hours to adjudicate an appeal from an ALJ decision. Current CALJ Debra Bice has advised that it should take an ALJ no more than two-and-a-half hours, on average, to adjudicate a case. CALJ Bice's position, reflected in the quotas set by the SSA, is that the ALJ responsible for fact-gathering, fact-finding, and ruling on each claim should spend less time per claim than the persons involved in writing and reviewing the ALJ's decision.

68.    The practical effect of requiring ALJs to dispose of 500-700 cases per year is underscored by the so-called "Cleveland Plan." Among other things, the "Cleveland Plan"

instructed ALJs and decision writers "not [to] produce a mere chronology of facts in the final decision unless it is necessary," to "[t]ouch the file as few times as possible," to include in the decision "just enough, but no more" evidence to support the outcome, and also advised that "Congressional Interest cases are 'Red Alert' priorities." These instructions requiring ALJs to attempt to walk a fine line between factually supported and legally sound decisions, and assembly-line justice more concerned with quantity than quality, demonstrate that the quota is unreasonable and infringes on ALJ decisional independence.

69.     The Honorable Jillyn Schulze, United States Magistrate Judge for the District of Maryland, remarked in May 2009 on the decisional quota of 500-700 decisions per year in no uncertain terms:

> "I am truly stunned by the suggestion that ALJs should decide 500-700 cases a year. I find that unconscionable. ... I can do maybe one of these cases a day – and that's a review where I've got two lawyers who are telling me exactly what I need to be looking at to be making the decision. So to be required to do 500 to 700 of these a year without anybody telling you what it is that you you're supposed to be looking at and having this universe that's this high of potential things that you're later going to be criticized about for not looking at, it just makes no sense whatsoever to me."

70.     The pressure exerted on ALJs by the quota is reflected in the substance of their rulings. Some ALJs respond by tending to grant more claims. For other ALJs, the quota impedes their ability to render carefully-reasoned, impartial decisions based on a fully developed factual record. Whatever the result of the pressure on an individual ALJ, the outcomes for the entire body of SSA claims are more variable and arbitrary when the factual record is not fully developed and ALJs are pressured to rush to judgment based on incomplete information.

71.     The quota of 500-700 decisions per year is what is referred to in academic management literature as a "stretch goal." A "stretch goal" is defined as "an organizational goal

20

with an objective probability of attainment that may be unknown but is seemingly impossible given current capabilities." *"The Paradox of Stretch Goals: Organizations in Pursuit of the Seemingly Impossible*," Academy of Management Review, Vol. 36, No. 3, 544, 547 (2011). Stretch goals may lead to deleterious consequences, including: narrowed focus and neglect of non-goal areas, increased risk taking, unethical behavior, inhibited learning, corrosion of organizational culture, decreased cooperation, and decreased intrinsic motivation. Lisa D. Ordonez, et al., *"Goals Gone Wild: The Systematic Side Effects of Overprescribing Goal Setting,"* Academy of Management Perspectives Exchange, Feb. 2009 at 7.

### The Illegal Quota Injures ALJs by Infringing on Their Decisional Independence

72. The SSA itself recognizes that it takes less time to issue a favorable decision than a decision denying benefits. By allotting a staff writer four hours to write a decision awarding benefits and eight hours for a decision denying benefits, the SSA concedes that an ALJ will best be able to meet the quota by issuing favorable decisions. As a Court reasoned almost thirty years ago when striking down another SSA program:

> "The evidence as a whole, persuasively demonstrated that defendants retained an unjustified preoccupation with allowance rates, to the extent ALJs could reasonably feel pressure to issue fewer allowance decisions in the name of accuracy. While there was no evidence that an ALJ consciously succumbed to such pressure, in close cases ... as a matter of common sense, that pressure may have intruded on the fact finding process and may have influenced some outcomes."

*AALJ v. Heckler,* 594 F. Supp. 1132, 1142 (D.D.C. 1984). The Court went on to find the SSA "insensitiv[e] to that degree of decisional independence the APA affords to administrative law judges" and that the program "could have tended to corrupt the ability of administrative law judges to exercise that independence in the vital cases they decide." *Id.* at 1143.

73. In order to increase the number of dispositions, ALJs have been told that once they find a way to award benefits in a case, they do not have to read the file any further.

74. That the quota, which is based solely on productivity, tends to dictate the outcome of some cases in favor of the allowance of benefits is further validated by a review by the SSA Office of Inspector General in February 2012, which found a direct relationship between ALJ productivity and allowance rates. It noted that nine of the twelve high-allowance ALJs decided more cases than the average of the other ALJs in the same office. In addition, of the twelve high-denial ALJs, eight decided fewer cases than the average of their peers in the same hearing office.

75. Thus, unrelenting SSA emphasis on meeting the quota infringes on decisional independence of some ALJs by tending to influence them to award benefits simply because it is quicker to award benefits than to deny them. That can be the case even though the ALJ may genuinely believe that the quota has no substantive effect. Research confirms that otherwise ethical persons may unwittingly act unethically when faced with stretch goals: "[B]ehavior prompted by stretch goals is leading to unethical behavior, without the knowledge of the protagonists of the unethical action ... focusing on goals actually distorts our perception of what is unethical behavior so that we are less likely to consider the ethical implications of our actions." *"When Goal Setting Goes Bad*," Harvard Business School – Working Knowledge, 2009 at 2-3. (Exhibit I.)

76. Other repercussions of the quota, characteristic of a "stretch goal," have included narrowed focus and neglect of non-goal areas (such as the quality of fact-gathering and decisions), increased risk taking (see below), corrosion of organizational culture (including poor

morale), decreased cooperation (between ODAR Managers and ALJs), and decreased intrinsic motivation (on the part of ALJs).

77.     The quota promotes risk taking in the form of shortcuts through the hearing process.  For example, ALJs have been told to set arbitrary time limits when reviewing a file (including by using an egg timer) in order to "force" themselves to move on.  As a result, ALJs may not read all of the medical and lay evidence.

78.     Some ALJs do not obtain complete medical records or additional medical opinions because it takes too much time to marshal and review the evidence.  As one ALJ has explained to the SSA Inspector General:

> "**Here is the chilling factor**: specifically, for over a year now, every time I considered whether to write a doctor requesting more information, whether to order a consultative medical examination, or whether to have a supplemental hearing with a Medical Expert, I tried not to think what it would cost me in terms [of] meeting the quotas.  Based on web postings and conversations, I believe that other ALJs have also felt the stress of this situation: **that development of a claimant's record could result in personal consequences for the ALJ.**"

(Emphasis in original.)  Similarly, ALJs may not allow a case to remain open post-hearing because they are pressured to move cases through the hearing process to comply with the Benchmarks.

79.     These and other shortcuts make it impossible for ALJs to elicit, review and understand evidence, especially in more complex cases, including evidence the relevance of which may only become known at the hearing.  Decisional independence is compromised because ALJs cannot prepare for and conduct hearings and decide cases in the manner they otherwise would, consistent with their statutory and regulatory obligations.

80.     One ODAR Manager has mandated a shortcut *sua sponte*, eliminating the ARPR

(ALJ Review PRE) stage of the hearing process at which an ALJ reviews the record prior to the

hearing.  (See Exhibit C at 2.)  Instead, cases will be put directly into the RTS (Ready to

Schedule) stage, without giving the ALJ an opportunity before the hearing to evaluate the

evidence or merits of a case and to order pre-hearing development of the case, if warranted.

81.     The impact of the quota on the quality of written decisions is well-recognized.

One ODAR Manager has insisted on compliance with the quota despite conceding that "Judges

who produce 350 cases per year presumably write decisions that are more thorough, more

carefully written and that more precisely describe the reason(s) for the decisions, when compared

to the decisions written by judges who produce 500 cases per year."  One HOCALJ told an ALJ

to sign a stack of decisions by the end of the day without reading them.

82.     The disciplinary steps taken by SSA and ODAR Managers to enforce the

production quota make it impossible for ALJs to render carefully-reasoned, impartial decisions.

As noted in a Congressional Report considering whether to allow performance evaluations of

ALJs (which Congress did not allow):  "The fear of discipline would inevitably mix into

decision-making.  To those outside the agencies, ALJs would lose the appearance of

independence which is so vital to the legitimacy of agency proceedings."  S. Rep. No. 1018, at

70-71.

83.     When benefits are denied, an ALJ has an obligation to clearly disclose and

adequately sustain all grounds upon which that disposition is based, *SEC v. Chenery Corp.*, 318

U.S. 80, 94 (1943) (Congress codified the *Chenery* principle in the APA at 5 U.S.C. §557(c));

and Courts of Appeals enforce *Chenery* by requiring the ALJ to "build a logical bridge between

the facts of the case and the outcome." *See Parker v. Astrue*, 597 F. 3d 920, 921 (7th Cir. 2010).

Because of the pressure to meet the decisional quota, ALJs often do not have time to review

adequately the written draft decisions of the staff writers or to write for themselves decisions

comporting with the *Chenery* principle. One ODAR Manager has advised ALJs not to worry

about whether cases are remanded by the federal district or appellate courts, but instead to

concentrate on meeting the quota.

84. Not only do the Benchmarks and Directive establish an illegal fixed production

quota, their enforcement by SSA is arbitrary, compounding their unlawful impact. A very recent

audit by the SSA Office of Inspector General reviewed ODAR monitoring of ALJs. It noted that

with regard to productivity, ODAR reports used a single factor, for example, number of

dispositions. The audit, however, noted "large variances in ALJ outcomes within and between

hearing offices," a variance that academics and commentators agree is "alarming." The audit

concluded that a monitoring system needed to be developed using a combination of factors, and

not simply a single factor such as number of dispositions. In other words, the audit confirmed

that each disability claim and every ALJ is **not** fungible, as the quota assumes.

85. As a result of the decisional quota, ALJs often cannot make considered judgments

on fully developed factual records, in violation of CALJ Cristaudo's own requirement that

decisions "provide[] findings and rationale that comply with the [Social Security] Act,

Regulations, and Rulings, and explains why the preponderance of evidence supports the

decisions and findings." (Exhibit E.)

86. The quota is the product of fiscal, political and other pressures reflected in the

fiscal year "budgeted dispositions" commitment made by SSA senior management to the Office

25

of Management and Budget. As the United States Supreme Court noted in *Butz*, the *sine qua non* of decisional independence is freedom from exactly those types of pressures. 438 U.S. at 513-14.

87. The United States Supreme Court in *Ramspeck*, 345 U.S. at 142, addressing an ALJ reduction in force, cautioned against "devious practices by an agency" that might infringe on decisional independence. The SSA's "devious practices" embodied in the Benchmarks and Directive, though disguised as innocent "guidelines" and "goals," are a performance evaluation and *de facto* fixed quota that infringe on ALJ decisional independence. The quota tends to dictate the outcome of some cases in favor of granting benefits, and in other cases results in arbitrary and legally insufficient decisions based on an incomplete development and/or review of the factual record.

88. While the MSPB at one time took jurisdiction over claims of infringement on decisional independence brought by SSA ALJs on a "constructive discharge" theory, it amended its Rules in 2006 and no longer hears such claims. See *Tunik v. Merit Systems Protection Board*, 407 F. 3d 1326 (Fed. Cir. 2005); 71 Fed. Reg. 34321 (June 14, 2006). Perhaps not entirely coincidentally, the Benchmarks and Directive were issued by then-CALJ Cristaudo shortly after the MSPB stopped hearing ALJ claims of infringement on decisional independence. ALJs now face a Hobson's choice either to follow ODAR orders to meet the production quota or to resist or defy ODAR orders they understand to interfere with their decisional independence, thereby subjecting themselves to discipline and the possible risk of losing their livelihood.

## Other Injuries Suffered by ALJs Resulting from the Quota

89.     In addition to the infringement on decisional independence detailed above, the Benchmarks and Directive injure ALJs in several other ways.

90.     ALJs take an oath to, among other things, uphold the United States Constitution. The decisional quota requires ALJs to disregard the procedural due process rights of disability claimants in direct contravention of that oath, and results in arbitrary and incomplete decisions.

91.     ODAR's dissemination of ALJ productivity data in order to increase pressure on ALJs and compel compliance with the quota results in public shaming, thereby harming the reputation of ALJs among their peers within the SSA and in other agencies.

92.     Because the SSA emphasizes quantity of dispositions over quality, ALJs do not have the time to document and support their decisions adequately.  Many federal judges have been critical of the work product of ALJs, including the use of boilerplate language not supported by the record and conclusions of law inconsistent with the medical evidence, *see, e.g., Bjornson v. Astrue*, 671 F. 3d 640 (7th Cir. 2012), thereby demeaning ALJs in the eyes of the federal judiciary and detracting from the public's perception of the integrity of ALJs.

93.     The Benchmarks and Directive require ALJs to violate their statutory and regulatory obligations, including, among other things, their duty to: (1) "look fully into the issues," question witnesses and accept documents into evidence, 20 CFR §404.944; (2) issue subpoenas if necessary for the full presentation of a case, 20 CFR §404.951; (3) issue a written decision that includes findings of fact and reasons for the decision, 20 CFR §404.953; (4) develop a complete medical history of the claimant for the preceding 12 months, and provide evidence at the hearing about the existence of work available for the claimant, 20 CFR

27

§404.1512; (5) consider all the evidence in the record, 20 CFR §404.1520; and (6) obtain

additional evidence, if necessary, to complete the factual record, 20 CFR §404.1520b.

94.     Many ALJs work longer hours without additional compensation in an attempt to

comply with the quota, thereby resulting in a constructive reduction of compensation.  The AALJ

conducted a survey in 2012 that showed that the pressure to comply with the quota has a

significant deleterious impact on the physical and mental health of many ALJs.  ALJs have

continued to work long hours despite the impact on their health.

95.     The opportunity for career advancement and transfers within the SSA is adversely

affected for ALJs who fail to meet the quota.

## Allegations of Individual Plaintiffs

96.     Judge Bretthauer issued 369 and 335 decisions the last two fiscal years,

scheduling between 30 and 50 cases per month.  She is committed to carefully reading the entire

record when adjudicating her cases and has been told she has the highest approval rating of any

ALJ in her office.  Judge Bretthauer experiences immense pressure to increase dispositions to

meet the current Evanston Hearing Office quota of 570 cases per ALJ.  She is incessantly

emailed by ODAR Managers regarding her disposition rate and the rates of her local, regional

and national colleagues, and has been subjected to off-the-record, performance-related

counseling by ODAR Managers who have told her to increase scheduling and the number of

dispositions.

97.     Although Judge Bretthauer has worked as quickly and ethically as possible, she

continues to be harassed about her scheduling and disposition rate.  Her HOCALJ told Judge

Bretthauer in 2012 that she was required to schedule 60 cases for *hearing* per month.  As

recently as January 2013, her HOCALJ directed Judge Bretthauer to schedule an average of 2.7 hearings per day to meet her quota. The HOCALJ followed up with an intimidating email. Even more recently, a non-ALJ Group Supervisor told her that based on year-to-date dispositions she was projected to issue only 291 decisions this fiscal year, and that to meet her decisional quota she "would need to issue an average of 60 *decisions* each month for the rest of the fiscal year" (emphasis added). This projection, however, was based solely on FY 2013 First Quarter statistics, a period during which she had taken over five weeks of leave. Judge Bretthauer then received a follow-up to this email from her Hearing Office Director about "where you need to be to work towards achieving Regional/National goals."

98. The quota infringes on Judge Henrie's decisional independence. Although he has met the quota in the recent past, because the cases have become more complex and time consuming to decide, Judge Henrie currently produces about 450 decisions a year, works as efficiently as possible, works after hours without compensation, and cannot produce more decisions without violating mandatory quality standards and sacrificing his judicial integrity. He frequently receives emails and memoranda regarding his production, and has been disciplined in the form of face-to-face or telephone "counseling" sessions by his HOCALJ and RCALJ, who have harassed him for scheduling and deciding fewer cases than the decisional quota mandates. Most recently, Judge Henrie was given a written "directive" mandating that he "immediately increase the number of cases you schedule on a monthly basis in order to achieve Agency [decisional] expectations for the remainder of the year." Judge Henrie was also advised that he would be given an additional 24 cases to hear every ten days, which is far more than is

reasonable and prudent and would overload him. Finally, he was threatened with possible disciplinary action should he fail to follow the written "directive."

99.     Judge Henrie finds it impossible to comply with both the illegal decisional quota and SSA and APA regulations regarding judicial standards without compromising the quality of his decision-making and the procedural due process rights of disability claimants. His HOCALJ, RCALJ and the decisional quota impose upon him inordinate pressure to simply award benefits and to cut corners that should not be cut, thus infringing upon his decisional independence.

100.    For each of the past five years, Judge Martinez has issued 500 decisions or more, but has had to cut corners in order to do so, primarily by not reading the whole record or by failing to read or revise drafts of decisions written by staff writers before signing them. The decisional quota prevents Judge Martinez from conducting hearings that follow Agency and APA regulations, especially with respect to ordering a second medical expert in complex cases. Indeed, ODAR Managers have told him to refrain from ordering multiple experts for a single case because doing so slows down the adjudicatory process. As discipline, he was also threatened with the loss of support personnel if he did not increase the number of scheduled hearings.

101.    The quota thus directly infringes on Judge Martinez' decisional independence. While he is not told explicitly how to decide cases, by pressuring him to produce at an unreasonable rate, he is at times forced to make decisions based on an incomplete record to the detriment of the procedural due process rights of disability claimants.

### The Procedural Due Process Rights of
### the Disability Claimants Have Been Violated

102.     When Congress passed the APA in 1946, it created a corps of hearing examiners (today's ALJs) conferring upon them a right of decisional independence to ensure they were free from interference by the parties and agency officials, and from political and other pressures.  In doing so, Congress preserved the procedural due process rights of disability claimants to a fair and impartial hearing on their claims.  *See* 5 U.S.C. §§550 *et seq.*, 42 U.S.C. §405(b); U.S. CONST. amend. V.

103.     The Benchmarks and Directive violate the procedural due process rights of disability claimants.  ALJs who do not review the entire file, fail to obtain complete medical records, do not leave cases open to elicit relevant evidence, do not review decisions prior to signing, and engage in other corner-cutting measures in attempts to comply with the quota, deprive claimants of the full and fair hearings to which they are entitled.

104.     ALJs have a special and close relationship with disability claimants whose claims they adjudicate.  They are required by law to protect the procedural due process rights of the claimants, regardless of whether they are represented by counsel, to fully develop the factual record regarding their claims, and to ensure a fair and impartial adjudication of their claims.

105.     Disability claimants are not likely to assert the violations of their procedural due process rights resulting from the quota because they are unaware of the quota and how it is utilized and enforced.  The claimants are also not likely to act on their own behalf because they lack the resources and legal acumen to do so.  The cost and burden of a Constitutional challenge are prohibitive for any individual claimant.  Thus, the Individual Plaintiffs and AALJ are as

effective proponents of the rights of disability claimants as the claimants are themselves, and may appropriately assert the rights of the claimants.

## CLAIMS AND RELIEF SOUGHT

### COUNT I

### For Declaratory Relief for Injuries to Individual Plaintiffs and All SSA Administrative Law Judges

106.     Paragraphs 1 through 105 above are realleged as if set forth verbatim herein.

107.     The Benchmarks and Directive are an illegal quota and/or an unreasonable production goal that injures the Individual Plaintiffs and all ALJs by, among other things, infringing on their decisional independence in violation of the Social Security Act and the Administrative Procedure Act, 5 U.S.C. §§554, 3105, 7521.

108.     Because the SSA has utilized and taken disciplinary action to enforce the Benchmarks and Directive, because the decisional independence of the ALJs has been infringed, and because the procedural due process rights of the disability claimants have been violated, this action presents a case of actual controversy pursuant to 28 U.S.C. §2201(a).

109.     Through this action, Plaintiffs ask this Court to declare that: (1) the Benchmarks and Directive are an illegal quota and/or unreasonable production goal; (2) the Benchmarks and Directive injure the Individual Plaintiffs and all ALJs by, among other things, infringing on their decisional independence; and (3) the Benchmarks and Directive violate the Social Security Act and Administrative Procedure Act, 5 U.S.C. §§550 *et seq.*

## COUNT II

### For Injunctive Relief for Injuries to Individual
### Plaintiffs and All SSA Administrative Law Judges

110.     Paragraphs 1 through 109 above are realleged as if set forth verbatim herein.

111.     Plaintiffs request a permanent injunction barring defendant, her successors, and the SSA from utilizing or enforcing the Benchmarks and Directive and from issuing any future directives or memoranda setting any specific number or range of dispositions by ALJs as quotas, goals, guidelines, or targets.

112.     Plaintiffs will suffer irreparable harm if utilization of the Benchmarks and Directive is not enjoined because the infringement on decisional independence of the Individual Plaintiffs and all ALJs will continue, and they will continue to be otherwise injured.

113.     Plaintiffs do not have an adequate remedy at law for the violations of the Social Security Act and Administrative Procedure Act alleged.

114.     Any harm that would result from the granting of injunctive relief is far outweighed by the harm that would result to Plaintiffs if injunctive relief is not granted.

115.     An injunction barring utilization of the Benchmarks and Directive will serve the public interest because the Individual Plaintiffs and all ALJs will be free from interference with their decisional independence, be capable of fully protecting the procedural due process rights of disability claimants, and be capable of fully protecting the Social Security Trust Fund and taxpayers by denying unfounded claims.

## COUNT III

### For Declaratory Relief for Violation of
### Procedural Due Process Rights of Disability Claimants

116.     Paragraphs 1 through 115 above are realleged as if set forth verbatim herein.

117.     The utilization of the Benchmarks and Directive violates the procedural due process rights of disability claimants.  U.S. CONST. amend. V.

118.     Because the SSA has utilized and taken disciplinary action to enforce the Benchmarks and Directive, because the decisional independence of the ALJs has been infringed, and because the procedural due process rights of disability claimants have been violated, this action presents a case of actual controversy pursuant to 28 U.S.C. §2201(a).

119.     Through this action, Plaintiffs ask this Court to declare that: (1) the Benchmarks and Directive are an illegal quota and/or unreasonable production goal; (2) the Benchmarks and Directive violate the due process rights of disability claimants; and (3) the Benchmarks and Directive violate the Social Security Act and Administrative Procedure Act, 5 U.S.C. §§550 *et seq*.

## COUNT IV

### For Injunctive Relief for Violation of
### Procedural Due Process Rights of Disability Claimants

120.     Paragraphs 1 through 119 above are realleged as if set forth verbatim herein.

121.     The utilization of the Benchmarks and Directive violates the procedural due process rights of disability claimants.  U.S. CONST. amend. V.

122.     Plaintiffs seek a permanent injunction barring defendant, her successors, and the SSA from utilizing or enforcing the Benchmarks and Directive and from issuing any future

34

directives or memoranda setting any specific number or range of dispositions by ALJs as quotas, goals, guidelines, or targets.

123.    Plaintiffs and disability claimants will suffer irreparable harm if utilization of the Benchmarks and Directive is not enjoined because the infringement on decisional independence of ALJs and violation of the procedural due process rights of disability claimants will continue.

124.    Plaintiffs and disability claimants do not have an adequate remedy at law for the infringement on decisional independence of ALJs and violation of the procedural due process rights of disability claimants.

125.    Any harm that would result from the granting of injunctive relief is far outweighed by the harm that would result to Plaintiffs and disability claimants if injunctive relief is not granted.

126.    An injunction barring utilization of the Benchmarks and Directive will serve the public interest because ALJs will be free from interference with their decisional independence, be capable of fully protecting the procedural due process rights of disability claimants, and be capable of fully protecting the Social Security Trust Fund and taxpayers by denying unfounded claims.

**WHEREFORE**, Plaintiffs pray for the following relief:

(1)  A declaration that the Benchmarks and Directive are an illegal quota and/or unreasonable production goal in violation of the Social Security Act and Administrative Procedure Act, 5 U.S.C. §§550 *et seq*.;

(2)  A declaration that the Benchmarks and Directive violate the procedural due process rights of disability claimants guaranteed by the United States Constitution;

(3)  A permanent injunction barring defendant, her successors, and the SSA from utilizing or enforcing the Benchmarks and Directive and from issuing any future directives or memoranda setting any specific number or range of dispositions by ALJs as quotas, goals, guidelines, or targets;

(4)  An award of plaintiffs' attorney fees and costs; and

(5)  Such other and further relief as may be just and proper.

**ASSOCIATION OF ADMINISTRATIVE LAW JUDGES, JUDICIAL COUNCIL NO. 1, IFPTE, AFL-CIO & CLC; CYNTHIA M. BRETTHAUER; ROBIN L. HENRIE; and GILBERT A. MARTINEZ**

By:      /s/ C. Philip Curley
         One of their attorneys

C. Philip Curley
Cynthia H. Hyndman
Laura Kleinman
ROBINSON CURLEY & CLAYTON, P.C.
300 South Wacker Drive
Suite 1700
Chicago, Illinois  60606
(312) 663-3100 Telephone
(312) 663-0303 Facsimile
pcurley@robinsoncurley.com
chyndman@robinsoncurley.com
lkleinman@robinsoncurley.com

Of counsel:

Robert H. Stropp, Jr.
Diana M. Bardes
MOONEY, GREEN, SAINDON, MURPHY & WELCH, P.C.
1920 L Street, N.W.
Suite 400
Washington, D.C.  20036
(202) 783-0010 Telephone
(202) 783-6088 Facsimile
rstropp@mooneygreen.com
dbardes@mooneygreen.com